1
2
3

HOVANES JOHN TONOYAN
6627 Beeman Ave
North Hollywood, CA 91606
818 281 7473
hoviktonoyan@gmail.com



4

*Plaintiff in Pro Se*

5

6

7

8   **IN THE UNITED STATES BANKRUPTCY COURT**

9   **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10  **SAN FERNANDO VALLEY DIVISION**

11

12

13   In re:

14   LUSINE CRISTINE DOKUZYAN

15              Debtor.

16   HOVANES JOHN TONOYAN

17              Plaintiff,

18        vs.

19   LUSINE CRISTINE DOKUZYAN

20              Defendant.

21

22

23

24

25

26

(Chapter 7 Case)

Bankruptcy Case No.: 1:22-bk-10283

Adversary No. _____

### COMPLAINT

- **TO DECLARE THE RIGHTS AND LEGAL RELATIONS OF THE INTERESTED PARTIES UNDER 28 U.S.C. § 2201**
- **TO EXCEPT DEBT FROM DISCHARGE UNDER 11 U.S.C. §§ 523(a)(2)(A)–(C) and 523(a)(6)**
- **TO DENY DISCHARGE UNDER 11 U.S.C. §§ 727(a)(2)–(5) and 727(a)(7)**
- **TO DISMISS THE CHAPTER 7 BANKRUPTCY CASE UNDER 11 U.S.C. §§ 707(a)(1), 707(b)(1) and 707(b)(3)(A)–(B) BY WAY OF THE COURT'S OWN MOTION**

Hovanes John Tonoyan ("**Creditor Tonoyan**" or "**Plaintiff**") alleges by way of

Complaint against Lusine Cristine Dokuzyan (the "**Debtor**" or "**Defendant**") as follows:

## NATURE OF THE ACTIONS

1.      Plaintiff Hovanes John Tonoyan files this Complaint (1) to judicially declare rights and legal relations of interested parties under § 2201; to determine dischargeability of certain debt owed to them pursuant to § 523(a) of the Bankruptcy Code, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code"); and/or (2) to object to the granting of a discharge to the Debtor under § 727(a) of the Bankruptcy Code; and/or (3) to invite the Court to invoke its sua sponte authority and inherent powers to dismiss the Debtor's case under §§ 707(a)(1), 707(b)(1) and 707(b)(3)(A)–(B); and/or (4) to lift, condition, or terminate the Automatic Stay.

## PARTIES AND RELATIONS

2.      Plaintiff is a former school-friend of Defendant. The friendship began in 2008 and ended on February 25, 2022 at the Defendant's wishes. Plaintiff before December 15, 2021 resided in Los Angeles County, in the State of California and has for the duration of the Bankruptcy Case been traveling abroad in the Republic of Georgia and the Republic of Armenia. Plaintiff is a Creditor listed in Defendant's Petitions, Amendments, Creditor Matrix, and Schedules E/F and as such has standing to bring the causes of action addressed in this complaint.

3.      Defendant is a former school-friend of Plaintiff. The friendship began in 2008 and ended on February 25, 2022 at the Defendant's wishes. Defendant as relevant to the Bankruptcy Case has always resided in Los Angeles County, in the State of California. Defendant commenced on March 12, 2022 under 11 U.S.C. § 301(a)–(b) a voluntary case under a chapter of this title by the filing with the Bankruptcy Court of a petition as an entity that may be a debtor under such chapter and submitted themselves to the jurisdiction of this Court. The commencement of a voluntary case under a chapter of this title constitutes an order for relief

under such chapter.

## JURISDICTION AND VENUE

4.      On March 12, 2022, the Debtor filed for relief pursuant to Chapter 7 of the United States Bankruptcy Code (the "**Bankruptcy Case**").

5.      On April 25, 2022, the first date set for the meeting of creditors under §341(a) for this Bankruptcy Case was held by the Chapter 7 Trustee for a length of about 22 minutes. In attendance was the Debtor and their Counsel, as well as an attorney from the United States Trustee's Office. The Debtor participated, answering questions from the Chapter 7 Trustee and the United States Trustee, and the meeting was adjourned to a second date set for June 1, 2022. At this 2nd meeting of creditors, the Chapter 7 Trustee adjourned it in less than a minute after announcing receipt of the Debtor's bank statements requested from the 1st meeting. As of June 23, 2022, there has been no entry of a date of termination on the case docket for the §341(a) meeting of creditors or a scheduling of an additional meeting.

6.      Plaintiff consents to the jurisdiction of this Court pursuant to Federal Rules of Bankruptcy Procedure 7008 for the limited purposes of this adversary Complaint and reserves any and all other rights without forfeiture or waiver.

7.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C § 157 and § 1334 and Rule 7001 of the Federal Rules of Bankruptcy Procedure. This is a core proceeding under 28 U.S.C. § 157(b). This Court has jurisdiction for fashioning declaratory relief under 28 U.S.C. § 2201 and based on such declaration may fashion any further relief against parties adversely effected under § 2202.

8.      Venue properly lies in this judicial district in that this civil proceeding arises under 28 U.S.C. § 1409.

9.      Federal Rules of Bankruptcy Procedure 4007(c) allows Creditor Tonoyan to bring this complaint no later than 60 days of the first date set for the meeting of creditors under §341(a).

## STATEMENT OF ALLEGATIONS AND OF FACTS

A.      **Background**

10.     Plaintiff and Defendant were former school-friends between 2008 to February 25, 2022. In recent years, Plaintiff and Defendant spent less and less time socializing with one another. In that timeframe, Defendant, through a job at a Samsung electronics store in Glendale, CA, became acquainted with a new friend, Felipe Kamey Mendez (the "Business Partner"). Defendant and the Business Partner sometime between and around 2019-2020, near when the COVID Pandemic occurred, distanced themselves from their job at Samsung either voluntarily, or through being laid off, or finding another job, or going on unemployment. In this economic transition period, they began to explore an idea-turned-real-business-operation of creating and selling arts, crafts, and apparel from home and through various vendors, in order to generate income and launch a business together. They eventually both left their jobs at Samsung in order to pursue this business idea on a full-time basis, with marketing and operations occurring entirely over the internet and with their electronic devices. While Defendant was collecting unemployment benefits in 2020, she was simultaneously working on, collecting earnings from, and launching this business venture with her Business Partner. Defendant would handle all the customer service, produce the designs, manage the websites, and skillfully print and bring-to-life all tangible goods from a digital mockup and creation to an actual physical product, ready to be packaged, shipped, and delivered to the doorsteps of customers. The Business Partner would organize and structure all the legal and ownership interests under his own name or under the

name of his business entity called "That One Guy With Glasses, LLC" (the "LLC" or the

"Business"). The Business Partner would provide primary financial infusions and operating

expenses, with occasional contributions from Defendant, either from her personal available

credit, unemployment proceeds, or based off of the sales proceeds she would earn through

contributing her labor and skills to this business. The LLC has now expanded and operated

through two DBAs: "StitchCult", which is now defunct, and "OtakuThread", which is still in

operation with over 30,000 followers and ongoing posts on Instagram alone, and many followers

and posts on other social media platforms, producing revenues and sales from before the filing of

and during the pending Bankruptcy Case.

11.     Upon information and belief, Plaintiff gradually became aware of most of these

pieces of information because Defendant both orally and in writing, conveyed these facts in

detail directly to Plaintiff, whether during the few in-person socializations they had, or the

infrequent phone calls, or voluminous text messages and social media interactions. For facts that

Plaintiff was unaware of, such as the name of the Business Partner or the LLC or DBAs, and the

publicly available internet webpages of the businesses, Plaintiff only became aware of them at a

later point in time either through very recent representations and misrepresentations of the

Defendant, and including through Plaintiff discovery, investigation, and inquiry into the

circumstances, filings, and information revealed by the Bankruptcy Case. Plaintiff possessed the

least amount of knowledge with the most amount of assumptions and representations relied upon

only conveyed from the Defendant alone, with no observation of the public pages yet unknown

to Plaintiff until March-April 2022, and with no interaction ever with the Business Partner, and

as time progressed from 2020 to the beginning of 2022, did Plaintiff become more and more

aware of the circumstances regarding Defendant's business operations and the connection and

concealed arrangements with the Business Partner.

12.     By the beginning of 2021 to mid-2021, Defendant began to convey to Plaintiff orally and in writing, in-person or via electronics, in the Los Angeles area, that their business was having trouble. Defendant would represent that vendors would take advantage of her and the Business Partner, that they would incur thousands of dollars in damages and losses due to defective machinery and equipment, or logistical and supply chain delays. Defendant would represent that although the Business itself was either doing well, or on the verge of doing well and being profitable, at one point even producing a screenshot of sales proceeds of over $6,000-$8,000 from one month alone. Defendant maintained the position that because she was beginning to max out her credit cards and available loans, that because personal and business expenses were rising, and that having all legal interests and registrations and control under the Business Partner was hampering her ability to influence the business beyond contributing her labor and talents and intellectual property, Defendant would often ask for loans from both Plaintiff and others who the Defendant knew or worked with, most of the time being rejected, but sometimes being given a modest loan, which the Defendant would pay back on time.

13.     Toward the mid-2021 to the end of 2021, Defendant, again either orally or in writing would communicate to Plaintiff about the Business troubles and need for funding and better equipment, this time communicating almost exclusively through electronic means over the internet, while still being in the Los Angeles area, and a majority of the time being confined to her home due to not having a Driver's License or any social life or education or employment outside of the home, other than producing orders and products within the home and leaving occasionally to drop them off at shipping and postal providers, or would stay home and play video games for hours with her Business Partner and stream it live over the internet, these facts

being based upon information Plaintiff discovered after the Bankruptcy Case was filed. Plaintiff would listen to Defendant and her grievances empathetically, encouraging Plaintiff to continue to work hard, follow her dreams, and that everything would be OK in the end.

14.    In mid-2021, Defendant asked Plaintiff to purchase on his credit card(s) two gaming computers worth thousands of dollars each. Defendant represented she will have sales proceeds soon to pay Plaintiff back. Defendant represented that time was running out on getting these computers, and she really wanted them. Defendant at the time omitted, or did not make a representation, that these computers would be used for work purposes. Having trusted Defendant, and wanting her to be happy and successful, Plaintiff purchased two expensive, top-of-the-line gaming computers, which Defendant—within the month or two afterwards—paid Plaintiff back in full for a total of a couple of thousand dollars.

15.    At the end of 2021, around December 2021, Plaintiff left Los Angeles, California to travel abroad in a time zone 12 hours away. Defendant was aware of these travel plans as they occurred. Defendant was aware that Plaintiff was far away from home, family, friends, and other safety nets and support systems. Plaintiff would share with Defendant as well, all through oral or in writing communications via the internet, that Plaintiff was going through difficult times too, and needed to be prudent and conservative with his financial wellbeing. Plaintiff would make Defendant aware that Plaintiff was not in a position to frivolously spend on anything, and had become fortunate enough to arrange modest, affordable housing with modest living expenses, enough to save and pay down his own existing debts as he continued to earn income and prepare to complete his two remaining courses for his academic degree over the summer.

16.    By early to mid-January 2022, Defendant was becoming more and more agitated over texts, communicating thoughts of self-harm and suicide, representing her frustrations to be

over business expenses that had ballooned, over criticisms and skepticism Defendant was facing

from family members who did not have confidence in her business skills, over a lack of a social

life with other friends from her school days, and over personal debts incurred by the Defendant

on her own name, that she was maxing out on and unable to make minimum payments on.

Defendant would convey to Plaintiff, in writing and via the internet over texts, that Defendant's

business had orders of products that had not been shipped out to customers, a backlog going all

the way back to October 2021 until January 2022. Plaintiff was concerned and worried for

Defendant but continued to live his own life and offer any emotional support he could to her,

even surprising her with a $250 Amazon gift card for her birthday in mid-January 2022.

17.    On or around January 18th, 2022, the conversation and situation with Defendant

took a turn for the worst, and unexpectedly. Defendant in writing, over Apple iMessage texts,

typed with her own hands using the keyboard functions on her electronic device, writings she

transmitted to Plaintiff of the following written statements in this excerpt of mutual exchange of

messages:

| Author Name | Recipient Name | Author Phone Number | Recipient Phone Number | Verbatim Content of Message / the Writing |
|---|---|---|---|---|
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | Is there any way possible to borrow some money from your card? Like I don't know how it'll work. If I can send these orders through my money is coming in normal and I can post. I can pay you back quick and pay the interest as well and give you more back if you want. Like I'm in a corner and I literally don't know what to do other than bankruptcy but it's so stupid when I'm Making money I just need to CATCH UP to be fine |
| Hovanes Tonoyan | Lusine Cristine Dokuzyan | 18182817473 | 18185161219 | All I want is to eat tacos with you and forget about everything |

| Author Name | Recipient Name | Author Phone Number | Recipient Phone Number | Verbatim Content of Message / the Writing |
|---|---|---|---|---|
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | I'm so tired |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | Until print is out of the fucking way and THEN I can launch new embroidery and literally be fine |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | I can't make anything new |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | I can't post or make a new drop to rake in money because we'll be flooded by comments asking where their order is |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | But I don't know where the fuck to get the money or what to do |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | If I can do that somehow I'll avoid bankruptcy and the business will go on normal especially when my sewing machine arrives |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | They're expecting their order to be shipped or shipping THIS MONTH |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | And I can use the money from my new orders to send out the old but it'll be a gradual process of a month and I've ran out of time |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | That I can't |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | That I need to send out |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | The issue is I have these print orders from the past 3 months |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | I took print away |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | If I just do embroidery im fine |

Tonoyan vs. Dokuzyan Adversary Complaint

| Author Name | Recipient Name | Author Phone Number | Recipient Phone Number | Verbatim Content of Message / the Writing |
|---|---|---|---|---|
| Hovanes Tonoyan | Lusine Cristine Dokuzyan | 18182817473 | 18185161219 | Omg 🙏 |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | I'm getting sales |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | Very well |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | My embroidery is doing well |

18.    After this exchange, Plaintiff considered Defendant's request for a loan.

Plaintiff's consideration was based on Defendant's representations that the extension of credit

and monies would act as a debt consolidation loan to save her from the brink of bankruptcy and

acquire breathing room to perform labor and operate her business ventures in time to meet her

obligations. Defendant represented that all the money would be used to pay Defendant's balance

owed to a vendor called Printify. Printify's business model operates in this manner: Merchants

operate their own stores and websites with slight integration with Printify, a service provider for

apparel and other printing products where artists and merchants can advertise and market their

products to customers, accept product orders through their own websites, collect profit + printing

production + shipping and miscellaneous proceeds in liquid funds deposited into their chosen

bank accounts, after which the Merchants send the production + shipping costs portion to

Printify, to then submit an order to be fulfilled including all the printing of the products, and

shipping and delivery to customers as the last destination in the process. At no point does the

Printify platform allow a negative balance to be accumulated, or a debt to be owed to them, or

for customer orders to be able to be fulfilled without having positive funds deposited on account

or connected to an appropriate payment method to do so. It is the Merchant's responsibility to

honestly advertise products to their customers, collect the total sales proceeds funds from their customers, and budget a portion of those proceeds to submit to Printify and fulfill customer orders on time. The crisis Defendant claimed to be in and had hindered and concealed Plaintiff on what really happened, was that all the money Defendant and their Business Partner—who Defendant did not mention was the sole merchant legally registered to the Printify account—took from their customers, was not accounted for, proceeds of at least $10,000 and much more. This resulted in the Business Partner being on the hook to fulfill customer orders that he and he alone had collected payments from, for a backlog of 4 months, otherwise he would be at risk of chargebacks, bad online reviews, and worse—investigations for *fraud* by payment processors, service providers, and vendors—as the potential consequences Defendant orally stressed to Plaintiff during the single FaceTime phone call to alert and warn Plaintiff what would purportedly happen to Defendant and her Business Partner, if the extension of credit and monies totaling of $11,000 from Plaintiff to Defendant was not rapidly approved and transferred to Defendant to submit to Printify by January 31, 2022 at the latest.

19.     Plaintiff and Defendant continued their exchanges in writing after January 18, 2022 until February 25, 2022, with only one brief oral phone call over Apple FaceTime on or around January 18, 2022 after the above correspondence, to finalize the next steps of the loan request. At the sum of the correspondences, Plaintiff agreed to extend $11,000 in electronic transfers via PayPal and Venmo to Defendant, including $820 in transaction fees to be added to the balance. Defendant agreed to pay in full a $4644 incurred on an Amex charge card that would become due on March 7th, 2022. Defendant upon receiving the funds in sequences, notified Plaintiff that she had submitted all the orders to Printify to fulfill the customer orders and get their products printed and delivered at last. In reality, however, the financial condition of

the Defendant did not change for the better—having transferred around $10,000, with $1,000 left to account for, the only person who benefitted and would have suffered without the funds was her Business Partner. By the Defendant's own statements, she was in a period of insolvency, the request for the loan was to save her from insolvency, and what ended up happening was none of the funds Defendant borrowed from Plaintiff went toward Defendant's debts or liabilities on her own name or of which she was personally obligated to satisfy. Defendant sunk deeper into a state of insolvency, doubling her liabilities with now a personal debt obligation to Plaintiff, purporting to labor for and operate a profitable business that was just down on its luck, and as Plaintiff begun to inquire further, growing uneasy with the impending March 7th, 2022 due date for the $4644 balance, that is when the façade of the Defendant began to evaporate.

20.      As the days drew closer to February 25, 2022, Plaintiff and Defendant discussed in writing alternative options for restructuring this specific balance due based upon a satisfactory advanced notice of Defendant to Plaintiff. This included Defendant telling Plaintiff in advance if she was unable to pay the full balance, or if she was able to pay it partially, or if Plaintiff needed to do some debt restructuring of their own. Plaintiff was at all times willing to compromise and be flexible to Defendant's many hardships—even offering to modify the interest rates and transaction fees incurred for these extensions of credit and monies, for Defendant to be able to meet a payment point that would work for them based on their anticipated earnings, having removed the Printify burden on their purported finances, leaving only their personal debts and liabilities, and purported business and operating expenses; but Defendant begun to shift away from earnest repayment discussion and was more vocal about her ongoing—and apparently not even alleviated in the slightest—financial and family troubles, and barriers she claimed to encounter in advertising and marketing her business operations on social media and other

1  platforms.

2      21.    To further urge and entice Plaintiff to approve Defendant's request to extend

3  credit and monies to Defendant, and divert skepticism by the Plaintiff throughout Plaintiff's

4  inquiring and monitoring of the Debtor's financial condition, the Defendant made additional

5  verbatim written statements and representations such as (quotation marks added for attribution):

6      - "And show them that they're wrong"
7      - "So we have to do it ourselves"
       - "No one ever believes in us"
8      - "And I'm so fucking close to catching up. Like it's right within arms reach
         but of course there's always challenges and things always get in the god
9        damn way"
       - "It's not FAIR"
10     - "I have my sister telling me I'm a horrible business woman and that we
         should stop and just a bunch of bullshit when I've put more work and
11       effort into this than she has put to ANYTHING in her life combined. I
         work every fucking day nonstop and don't get rest or peace or
12       ANYTHNG"
       - "Never take anything serious"
13     - "And after all of that, all the effort you put it starts to crumble. And then
         you have people looking down at you. My family members don't take my
14       business seriously and all look at me skeptically when I say I don't work
         and run the business and they ALL expect it to fail"
15     - "So I was forced to use this print company who in turn fucked me over
         even more with their crazy ass shipping prices it was just constant cycle of
16       being fucked over and none of it you could avoid and none of it was your
         fault"
17     - "And I emailed them saying if they changed the paper and that it was
         wrong and made FB posts and was ignored because they KNEW it was
18       different"
       - "And I had all these ORDERS"
19     - "Which meant I wasted $800 and 10k on the machine and the media didn't
         work"
20     - "I think they changed it or they sent me faulty paper and they fucked me
         over completely"
21     - "And NONE of it worked"
       - "This new paper"
22     - "These assholes sent me"
       - "But whatever I could handle it"
23     - "And it was a given that about 10 sheets of paper give or take wERENT
         going to work right"
24     - "$800 for 100 sheets"
       - "I buy paper from them"
25     - "But THEN"
       - "And I did it somehow I managed"
26     - "No rest"
       - "Over and over and over"

- "And then come home and work on print"
- "I would go to work at Samsung"
- "Everyday I would burn it more and just put bandaids"
- "That was broken"
- "Burned my entire arm on the heat press"
- "I did like 50 + a day"
- "On a Single clothing"
- "To get it prepped and put"
- "There was like 7 steps"
- "As in"
- "I had to do myself"
- "Keep in mind the print"
- "But whatever I figured it out somehow and made use of it"
- "Fought with the company tooth and nail and they spun me around like an idiot and didn't do shit to help"
- "No matter what"
- "Properly"
- "Couldn't do the color BLACK"
- "Turns out it's a pile of shit"
- "Leases to buy it"
- "Whatever whatever"
- "I got this print machine that was supposed to make things better and they said this model was the best"
- "And it spiraled"
- "Things were out of my control completely"
- "It's kind of the same with this god forsaken business"
- "4 fucking thousand dollars away"
- "That it's viable"
- "And proving to everyone"
- "But getting this business off the ground"
- "I care about NOTHING"
- "And sacrificed my livelihood for it"
- "MUCH
- "Because I tried so hard and did so NUCH"
- "Idc if my health goes to more shit"
- "Nothing will be worthwhile"
- "If this business slips through my hands after all of this"
- "Now if I add more options with the embroidery machine"
- "I wouldn't be asking you if I didn't know for a fact that I'll be able to pay it off and then some. Embroidery makes a ton of money. Not only that, but I'll be able to make beanies and caps so more profit. All that money you saw is only sweatshirts"
- "Because I'm not taking print anymore so it'll only cover until we catch up"
- "And it won't be a constant use"
- "The money will go on orders only"
- "I need a couple thousand to be caught up with all my stuff. Maybe like 6-7k? But once I launch new embroidery and be able to post I will be fine with making money. I've been making like $800-1k a day already with the old embroidery I have"

22.     Upon reaching on or around February 14, 2022, less than a month away from the

due date of March 7, 2022 for the $4644 balance, as the Plaintiff continued to inquire about the

operational and revenue status of the Defendant's purported business, including the Defendant's

financial condition, the Plaintiff and Defendant held this exchange in the same written, Apple

iMessage text correspondence format as their earlier conversations, only the Defendant became

more belligerent and hostile the more worried Plaintiff got about the balance due date and the

lack of adequate responses and commitment to repayment Plaintiff was receiving from the

Defendant:

| Author Name | Recipient Name | Author Phone Number | Recipient Phone Number | Verbatim Content of Message / the Writing |
|---|---|---|---|---|
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | I can't sleep. I can't rest. It's constant stress and anxiety and depression and suicidal thoughts. My body is breaking down and everything hurts and my mental health is nonexistent. I don't know how to get the point across that I am a shell and going through the fucking motions of existing. So no, I didn't hang out and said no. But also I've turned down everyone else because I CANT AFFORD a break when I have orders and debt and a bunch of shit to do that gets piled on if I so much as miss a day. |

| Author Name | Recipient Name | Author Phone Number | Recipient Phone Number | Verbatim Content of Message / the Writing |
|---|---|---|---|---|
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | I have been working every day nonstop since the end of 2019. I don't get days off. I don't hang out with friends. I don't even talk to them my work consumed my entire fucking life. I've seen Sofia and Naira only twice in the past several months and one was because it was a birthday I couldn't say yes to and the other because they surprised me for my birthday with tickets paid for Disneyland I couldn't say no to. Do you think I'm talking to people 24/7 having a social life and hanging out? I don't talk to anyone. I am straight up suicidal and if I didn't have debt or owe anyone anything i may have actually gone ahead and killed myself so I could have a break from it all but I don't want to inconvenience anyone around me. |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | You do realize I was working 24/7. I've left the house or actually went to hang out with someone only the tiniest amount since 2019. Like counting on one hand. |
| Hovanes Tonoyan | Lusine Cristine Dokuzyan | 18182817473 | 18185161219 | Question - how many times did we hang out in 2021? How many times did you say yes to any invite to get McDonalds or play COD? Do you have a YES or NO answer to these questions, not PARAGRAPH answers? |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | I don't want to touch my PC because I use it everyday for work and I have programs on it. Just let me work and launch what I need to and then we can talk. I have a few options I haven't done yet let me make the money up and I will give updates |
| Hovanes Tonoyan | Lusine Cristine Dokuzyan | 18182817473 | 18185161219 | question, as a last resort, can you sell those GPUs you got last year |
| Hovanes Tonoyan | Lusine Cristine Dokuzyan | 18182817473 | 18185161219 | Got |
| Hovanes Tonoyan | Lusine Cristine Dokuzyan | 18182817473 | 18185161219 | As a last resort, can you sell those GPUs you for last year |

Tonoyan vs. Dokuzyan Adversary Complaint

| Author Name | Recipient Name | Author Phone Number | Recipient Phone Number | Verbatim Content of Message / the Writing |
|---|---|---|---|---|
| Hovanes Tonoyan | Lusine Cristine Dokuzyan | 18182817473 | 18185161219 | Question |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | I ordered needles so I'll be able to make t shirts and beanies and they shipped today so I am waiting for it to arrive. I'm going to make them and launch and see how it goes since people wanted them |
| Lusine Cristine Dokuzyan | Hovanes Tonoyan | 18185161219 | 18182817473 | Yes I would let you know |
| Hovanes Tonoyan | Lusine Cristine Dokuzyan | 18182817473 | 18185161219 | last thing i want to is just add to more and more stress on everything and everyone |
| Hovanes Tonoyan | Lusine Cristine Dokuzyan | 18182817473 | 18185161219 | my mom's been stressing a lot now, obviously, with me stressing, shushan keeps asking me when I expect to get paid back, and it's obviously a shitty time on all 4 corners right now |
| Hovanes Tonoyan | Lusine Cristine Dokuzyan | 18182817473 | 18185161219 | so question, if you weren't able to come up with the $4600-4700 by March 7 - you'd let me know, like, ASAP, right? |

23.     By or around February 21 through February 25th, the communication between Plaintiff and Defendant had an unprecedented breakdown, one that had never occurred in the 15 years of friendship preceding this loan. When Plaintiff made one last inquiry to the Defendant, this time shifting the focus away from the finances and more upon the psychological and social well-being of the Defendant, in order to ascertain her motivations and remaining answers for these circumstances, Defendant responded, in like manner as the previous included written statements:

- "I sent it through PayPal. I'm in negatives and didn't want to have some of the money be gone if used my account for Zelle."
- "Would PayPal work instead for sending it?"
- "I've been working day and night and whatever I have right now I'm going to send to you. I haven't paid any of my bills or cards and saved it all so you can have it. I'll send more before your card due date. Where do you want me to send the money?"

- "I'm sorry to hear you're not feeling well and I do hope you get better soon. However, I don't agree with that and do not want to be put on a pedestal and judged. As I have promised before, I will make sure to pay the amount mentioned above on the due date."
- "If you're planning a virtual court meeting with pre-appointed judges to go over my life and social interactions and deem me a bad friend or person, then I can make things easier and say let's not be friends. That doesn't concern me, what does is me paying your card payment in March like I have promised and have been trying to do, so I'm going to get back to that and I will reach out again before your due date with the $4644.48. That is my priority."

**B.    Bankruptcy Petitions, Amendments, Schedules, and SOFAs**

24.    The Defendant sent on or around February 25, 2022 via PayPal to Plaintiff $649 toward the $4644 balance due on March 7, 2022.

25.    Having received no further correspondence or statements or payments from the Defendant after February 25th passed, the Plaintiff arranged to pay and satisfy a portion of the $4644 balance by the March 7, 2022 due date. Plaintiff continued to remain in positive status with his creditors, aside from being stretched extremely thin due to having liquidated his available credit and checking account cash savings for the $11,000 transfers to Defendant.

26.    On or around March 9th, 2022, the Plaintiff sent an email to Defendant, in the spirit of a pre-small clams filing demand letter requesting Defendant to pay the remaining $3995 balance from the original $4644 balance, having left the entire liability on Plaintiff to have to satisfy and not become delinquent on, keeping in mind that this entire financial transaction dilemma had been a negative incurring upon the Plaintiff, and Plaintiff was only urging Defendant to cover the most time-sensitive balance, which did not have a revolving portion unlike other credit cards used in the transfers to Defendant.

27.     The Pre-Small Claims Filing Demand Letter went unanswered by the Defendant.

28.     On or around March 14, 2022, Sevan Gorginian (Counsel for Defendant) transmitted an email to Plaintiff alerting Plaintiff that Defendant had filed for Chapter 7 bankruptcy relief on March 12, 2022, having included Plaintiff as a creditor for the debts to be discharged, and warned Plaintiff not to contact Defendant or otherwise violate the automatic stay imposed and otherwise entice Counsel for Defendant to seek sanctions including payment of his attorney fees. Having been aware that Plaintiff was residing in a foreign country operating under the Hague Service Convention with no current address in the United States known to Counsel, Counsel for Defendant had not properly noticed any of the bankruptcy filings as they pertain to Plaintiff.

29.     By virtue of filing for Chapter 7 Bankruptcy relief, receiving the protection of an automatic stay unabated, with the goal of achieving a discharge of all liabilities—such as the entire extension of credit and monies to Defendant, the Defendant has now put Plaintiff in an extremely compromised and untenable position to service the entirety of the debts, expenses, damages, and injuries incurred out of his own pocket, vitiating any benefit the Defendant's de minimis repayment of $649 provided.

30.     Throughout the life of the Bankruptcy Case, the Debtor has submitted numerous amendments, with the following an index and summary of the core contents to bring attention to:

- On the initial March 12th, 2022 filing for Chapter 7 relief,
    - Defendant answered and stated in writing under oath "No" to the question "Are you a sole proprietor of any full- or part-time business?";

- o Defendant answered and stated in writing under oath "Yes" to the question "Are your debts primarily consumer debts?";

- o Defendant answered and stated in writing under oath "$27,929" of unsecured claims to creditors for the section asking to "Summarize Your Liabilities";

- o Defendant answered and stated in writing under oath "$500" for monthly income and "$480" for monthly expenses;

- o Defendant answered and stated in writing under oath "$10" for the positive balance on a Citibank checking account, listing no other checking or depository or cash accounts;

- o Defendant answered and stated in writing under oath "No" to the question "Do you own or have any legal or equitable interest in any business-related property?";

- o Defendant answered and stated in writing under oath "No" to the question "Do you have other property of any kind you did not already list?";

- o Defendant answered and stated in writing under oath "No" to the question "Do you have any executory contracts or unexpired leases?";

- o Defendant answered and stated in writing under oath "No" to the question "Do you have any codebtors?";

- o Defendant answered and stated in writing under oath "Not Employed" to the question "Fill in your employment

information.";

- o Defendant answered and stated in writing under oath "$0" to the questions asking to "List monthly gross wages, salary, and commissions" and "calculate gross income.";

- o Defendant answered and stated in writing under oath "$0" to the questions asking to "List all other income regularly received." other than reincorporating the "$500" monthly income which is answered as "Parents" for the "Source";

- o Defendant answered and stated in writing under oath "Debtor is seeking new employment or may go back to school" to the question asking "Do you expect an increase or decrease within the year after you file this form?" for income entries;

- o Defendant answered and stated in writing under oath "$18,863" in "Unemployment Benefits" for the "January 1 to December 31, 2020" period;

- o Defendant answered and stated in writing under oath "No" when asked "Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?";

- o Defendant answered and stated in writing under oath "No" when asked "Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefitted an insider?";

Tonoyan vs. Dokuzyan Adversary Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

o   Defendant answered and stated in writing under oath "No"
    when asked "Within 2 years before you filed for bankruptcy,
    did you give any gifts with a total value of more than $600 per
    person?";

o   Defendant answered and stated in writing under oath "Yes"
    when asked "Within 2 years before you filed for bankruptcy,
    did you sell, trade, or otherwise transfer any property to
    anyone, other than property transferred in the ordinary course
    of business or financial affairs?", listed "Printify" as the
    recipient, listed "None" as the relationship, described it as
    "Debtor's funds about $10,000" transferred "on account of a
    debt to Printify" and "through funds borrowed by a creditor"
    referring to Hovanes John Tonoyan, with a transfer date of
    "January 27, 2022".

o   Defendant answered and stated in writing under oath "Yes"
    when asked "Do you hold or control any property that someone
    else owns? Include any property you borrowed from, are
    storing for, or hold in trust for someone." and described "Felipe
    Kamey Mendez" as the owner, living in "North Hollywood,
    CA", with the property located at "7635 Bluebell Avenue,
    North Hollywood, CA 91605" which is the residence of
    Defendant, and described the property as an "Embroidery
    machine and computer and printer. Debtor's friend owns this

embroidery machine that is stored temporarily at debtor's

house, because the friend's apartment is too small to store it.

This is not debtor's property, listed for disclosure purposes."

and valued at "$18,000";

   o Defendant answered and stated in writing under oath "No"

      when asked "Within 4 years before you filed for bankruptcy,

      did you own a business or have any of the following

      connections to any business?"

   o Defendant answered and stated in writing under oath "No"

      when asked "Within 2 years before you filed for bankruptcy,

      did you give a financial statement to anyone about your

      business? Include all financial institutions, creditors, or other

      parties."

   • Defendant has made numerous conflict amendments to their filings,

      first representing that they are unemployed and have no income, and

      months later do they amend to disclose some form of income and

      freelance work. Creditors, the Trustees, and the Court should not have

      to engage in painstaking tug-of-war to reach the truth.

31.    Since learning of the Bankruptcy Case filing while preserving all rights and

protections in connection to it, Plaintiff has made good-faith attempts and meet-and-

confer with Counsel for Defendant via email correspondence and invitation for Zoom

conferencing to no avail. Counsel's last correspondence consisted of unhinged, immature,

and unprofessional insults against Plaintiff for attempting in good-faith to reach a

resolution to these matters, to obviate the need to move forward with litigation, with

Counsel instead pulling back into the shadows with a final remark that all correspondence

from Plaintiff will be filtered out and ignored.

**C.**     **Testimony at the 341 Meeting of Creditors**

32.     On April 25, 2022, the 341 Meeting of Creditors was held.

- Defendant answered and stated orally under oath "Yes" when asked by
  the Chapter 7 Trustee "Do you solemnly swear or affirm the testimony
  you're about to give is the truth, the whole truth, and nothing but the
  truth?";

- Defendant answered and stated orally under oath "Yes" when asked by
  the Chapter 7 Trustee "And you're listing yourself as unemployed at the
  moment, is that correct?";

- Defendant answered and stated orally under oath "Yes" when asked by
  the Chapter 7 Trustee "Did you read the bankruptcy information paper?
  Did you sign your bankruptcy papers? Did you read them, and do you
  understand them?";

- Defendant answered and stated orally under oath "Yes" when asked by
  the Chapter 7 Trustee "There have been several amendments of them, is
  that correct?";

- Defendant answered and stated orally under oath "Yes" when asked by
  the Chapter 7 Trustee "To clarify them and make them more accurate,
  would that be correct?";

- Defendant answered and stated orally under oath "Yes" when asked by the Chapter 7 Trustee "Do you believe the current form of your papers is accurate and true?"

- Counsel for Defendant answered and stated orally "She has a PayPal account that's linked to the Citibank. The Citibank is disclosed. So, PayPal is not like a bank account, but I just want to clarify that. So, the Citibank is on there, it's just linked to her PayPal, but that's pretty much it." when asked by the Chapter 7 Trustee "Are there any more changes that you need to tell me about today?";

- Defendant answered and stated orally under oath "Yes" when asked by the Chapter 7 Trustee "Did you hear what your COUNSEL just said? Is that accurate?";

- Defendant answered and stated orally under oath "Correct" when asked by the Chapter 7 Trustee "You're testifying, along with your DEBTOR that -- your COUNSEL -- that you have listed everything of value that you have, and all of your creditors, is that correct?";

- Defendant answered and stated orally under oath "Yes, but I don't use them" when asked by the Chapter 7 Trustee "You had a PayPal account that was linked to your Citibank account. Did you also have a Venmo, or Cash App account, linked to your Citibank account?";

- Defendant answered and stated orally under oath "Yes I -- I put in my bankruptcy papers, that I paid online service -- I paid the website Printify $10,000 on a balance owed by my friend. So, it was $10,000,

around $10,000 to Printify." when asked by the Chapter 7 Trustee "Have you sold or transferred anything greater than $5,000 in the last four years?";

- Defendant answered and stated orally under oath "Yes" when asked by the Chapter 7 Trustee "I have a copy of your 2020 tax return. Is that a true and correct copy of what you filed with the government?";

- Defendant answered and stated orally under oath "I had an extension. I have not filed yet." when asked by the Chapter 7 Trustee "Did you file a 2021 tax return?";

- Counsel for Defendant answered and stated orally "I can answer that quickly, and then she will -- I just want to make it clear -- it was on account of a -- an account that her friend had, so it's not her debt. So, she just covered the debt for her friend." when asked by the Chapter 7 Trustee "Let's talk about the money, the $10,000 that you transferred, was that on account of an antecedent debt? I mean money that you owed. Why did you send them the $10,000?";

- Defendant answered and stated orally under oath "That is correct." when asked by the Chapter 7 Trustee "Lusine, are you telling me that you paid someone else's debt?";

- Defendant answered and stated orally under oath "Because my friend needed money and I wanted to help." when asked by the Chapter 7 Trustee "Why did you do that?";

- Counsel for Defendant answered and stated orally "I'm pretty sure, just

one second, let me check. Felipe...? No, they're not listed, Ms. Goldman, we can list them." when asked by the Chapter 7 Trustee "So essentially, you loaned your friend money. Is he listed as a creditor in the bankruptcy case?";

- Counsel for Defendant answered and stated orally "Ms. Goldman, Ms. Goldman, just a second. But to her, it's not an obligation that he owes to her. She just covered a debt for him, but she doesn't interpret that as the friend owing her money." when asked by the Chapter 7 Trustee "Well, if the obligation -- if he essentially owes her money, because she paid one of his debts, I think it should be listed, and then let's talk about –";

- Counsel for Defendant answered and stated orally "Well, he owed the money to Printify –" when asked by the Chapter 7 Trustee "Without her paying the debt, he still owes the debt, how else would you interpret it COUNSEL?";

- Counsel for Defendant answered and stated orally "Right, but she just helped him –" when asked by the Chapter 7 Trustee "She advanced money on an obligation –";

- Counsel for Defendant answered and stated orally "He owed -- right, she paid his debt –" when asked by the Chapter 7 Trustee "He owes the money, she didn't, she paid him –";

- Counsel for Defendant answered and stated orally "Right, but –" when asked by the Chapter 7 Trustee "-- so, he didn't owe it anymore, she paid his debt.";

- Counsel for Defendant answered and stated orally "Yes, Ms. Goldman that -- and she's next to me, she's nodding her head, she'll testify for the same. It was somewhat of a gift, she has no -she doesn't consider her friend Felipe to be a creditor. She just paid the debt for him. But she does not consider him a creditor, she doesn't think he owes her money." when asked by the Chapter 7 Trustee "Are you telling me it's a gift? I just want to clarify, okay? Let's get it clarified.";

- Counsel for Defendant answered and stated orally "Yeah." when asked by the Chapter 7 Trustee "Alright, so you took money from someone else that you couldn't repay, you paid someone else's debt. I just want to make sure that I'm clear on this. So, you either –

- Defendant answered and stated orally under oath "Yes." when asked by the Chapter 7 Trustee "-- took the cash advance or borrowed money from someone else, took that money, and paid off Felipe's debt, which you didn't owe, and now you're telling me it's a gift, and he doesn't owe you anything. I just want to make sure that that's what you're testifying to here."

- Counsel for Defendant answered and stated orally "Uh – She –" when asked by the Chapter 7 Trustee "Whether or not she believes he's a creditor -- so you think it's okay to take money from someone else and pay off someone else's debt, is that correct?";

- Defendant answered and stated orally under oath "I wanted to pay Hovanes back, for working - I work as a freelance artist, but times got

rough, and I could not find a job." when asked by the Chapter 7 Trustee
"-- just a minute, let me finish. Let her answer, Sevan. Let her answer.
This is her story, this is her story. I want her testimony. So, Lusine, you
want to tell me exactly what you did here?";

- Defendant answered and stated orally under oath "Yes." when asked by
the Chapter 7 Trustee "Well, I understand that, but that doesn't explain
to me -- well let's just go on, alright. Right now, your testimony is, you
took money from someone else and paid off a third-party debt, and you
don't think the other party owes you any money and shouldn't be listed
as a creditor. I mean, that's what I'm understanding you to say, is that
correct?";

- Counsel for Defendant answered and stated orally "If you don't agree
with her say no." and Defendant followed up with "Um, I -- I don't
agree." when asked by the Chapter 7 Trustee "That you think you can
use other people's money to make a gift, is that correct?";

- Counsel for Defendant answered and stated orally "No, I'm not, she's
just standing here, she doesn't know how to respond to your questions,
so I'm telling her if she doesn't agree then say –" when asked by the
Chapter 7 Trustee "And why not? And don't feed her answers, Sevan.";

- Defendant answered and stated orally under oath "I understand your
question. Yes, ma'am. I understand your question." when asked by the
Chapter 7 Trustee "No, she knows what the question is, and she knows
very well what I'm asking her. That she's basically saying to me: "I

borrowed money from someone else. I haven't paid them back. I took that money. I paid someone else's debt that I didn't have to pay. And I don't think that person owes me any money." That's what I want to understand, is that what she's saying?";

- Defendant answered and stated orally under oath  "Um, so I -- at the time, I was -- I had -I knew -- I was going to pay Hovanes back. I never said I was not going to pay him back. I tried my best to pay him back, and whatever money I had made, and did have, I did send Hovanes. However, Hovanes, from the very beginning, he was hostile, and he blocked me for a time, he blocked me, and said he was not going to talk to me for four years, and -- and did not mention anything about me paying him back his debt. He told me two times that he did not want me to pay back his debt. And then he blocked me, did not mention his debt. And I did pay him back how much I had, I did pay him some, yes." when asked by the Chapter 7 Trustee "All right, and is that your testimony?";

- Defendant answered and stated orally under oath "That is correct." when asked by the Chapter 7 Trustee "Alright, you paid him some, I understand that. I still am not clear why Felipe doesn't owe you any money, but we'll just move on. You also say that you're holding $18,000 worth of embroidery machinery that is not yours, that it belongs to Mr. Mendez, is that correct?";

- Defendant answered and stated orally under oath "No, nothing has ever

belonged to me." when asked by the Chapter 7 Trustee "Has it ever belonged to you?";

- Defendant answered and stated orally under oath "Correct. He lives in a small apartment; he does not have room for the machinery." when asked by the Chapter 7 Trustee "And you have all this at your house because he doesn't have room for it, is that your testimony?";

- Defendant answered and stated orally under oath "He does, it's his machine." when asked by the Chapter 7 Trustee "And who uses the machinery?";

- Defendant answered and stated orally under oath "He comes to my house, yes, to work." when asked by the Chapter 7 Trustee "So, he comes to your house, your apartment, to work?";

- Defendant answered and stated orally under oath "No, I use it -- I use it to learn and I use it for my own, I've never used it for profit, no." when asked by the Chapter 7 Trustee "Do you use the equipment?";

- Defendant answered and stated orally under oath "I draw art." when asked by the Chapter 7 Trustee "So, you don't work for his company?";

- Defendant answered and stated orally under oath "I draw art, um – the designs are my designs, they're freelance, I'm a freelance artist." when asked by the Chapter 7 Trustee "Do you do any work for his company?";

- Defendant answered and stated orally under oath "I never expect payment." when asked by the Chapter 7 Trustee "So, you do design art for him. Does he pay you?";

Tonoyan vs. Dokuzyan Adversary Complaint

- Defendant answered and stated orally under oath "He has paid me, but I never expect payment, because in my eyes, it is me um -- it's just helping out a friend who needs it." when asked by the Chapter 7 Trustee "And why is that?";

- Defendant answered and stated orally under oath "None at all ma'am, none at all." when asked by the Chapter 7 Trustee "Alright, so your testimony is: not only did you pay off one of his debts, you now do work for him potentially for free. I just want to understand -- do you have any ownership interest in this business?";

- Defendant answered and stated orally under oath "With -- well, the designs -- but I did not help him start." when asked by the Chapter 7 Trustee "Did you help him start it?";

- Defendant answered and stated orally under oath "Well, it's his machine, so he takes my designs, and he embroiders." when asked by the Chapter 7 Trustee "Alright, so they're your designs. You're saying he bought all the equipment. He has no room for the equipment at where he resides. So, it's at your location, and he comes to where you're living, if he's going to work on it. What does he do?";

- Defendant answered and stated orally under oath "No, he sells them, ma'am. It's his -- it's his business." when asked by the Chapter 7 Trustee "And then he sells them, or you sell them?";

- Defendant answered and stated orally under oath "That's just for personal use ma'am." when asked by the Chapter 7 Trustee "So why do

you have a PayPal or Cash App account? And what's your Venmo account for?;

- Defendant answered and stated orally under oath "That is correct." when asked by the Chapter 7 Trustee "The Venmo is for personal use?";

- Defendant answered and stated orally under oath "PayPal was always for personal use as well." when asked by the Chapter 7 Trustee "And what about the PayPal?";

- Defendant answered and stated orally under oath "Um, yeah, I was using them personally, and no vendor paid me anything." when asked by the Chapter 7 Trustee "I said, were you using those accounts personally, and no -- no other vendor paid you anything?";

- Defendant answered and stated orally under oath "Yes, that is correct." when asked by the Chapter 7 Trustee "So, you had no income from the PayPal account or the Venmo account, is that correct? Is that correct?";

- Defendant answered and stated orally under oath "Correct, it was only the Citibank that it's been tied to." when asked by the Chapter 7 Trustee "And the only account that they were tied to was the Citibank account?";

- Defendant answered and stated orally under oath "That is correct." when asked by the Chapter 7 Trustee "And it's your testimony right now that you're making basically no money and you're getting -- or maybe -- $700 a month, and your parents are helping out, and a friend?";

- Defendant answered and stated orally under oath "Yes, I am living with my family. The money that I have made is just freelance artwork. So, I

Tonoyan vs. Dokuzyan Adversary Complaint

have been paid, Felipe has paid me, but I don't expect payment. I never --
- it was never contracted or anything for me to -- for it -- for him to take
my art and pay me." when asked by the Chapter 7 Trustee "Are you
living with family members?";

- Counsel for Defendant answered and stated orally "Sure." when asked
  by the Chapter 7 Trustee "Alright. Sevan, I want to see the six months of
  her Citibank statements prior to the filing just to verify this.";

- Defendant answered and stated orally under oath "No ma'am, I can't
  drive. I don't have a driver's license, and I don't have a vehicle." when
  asked by the Chapter 7 Trustee "Okay. Also, do you have a vehicle? A
  car?";

- Defendant answered and stated orally under oath "The -- it's, his
  business is " THAT ONE GUY WITH GLASSES LLC"." when asked
  by the United States Trustee "What is the name of Felipe's business?";

- Defendant answered and stated orally under oath "Um, some other
  name." when asked by the United States Trustee "Okay, and does the
  business have any other names? In other words, when he sells the
  product, does he do it under "One Guy With Glasses" or some other
  names?";

- Defendant answered and stated orally under oath "There's two. One was
  known as StitchCult. The other one is OtakuThread." when asked by the
  United States Trustee "What is the other name?";

- Defendant answered and stated orally under oath "Yes." when asked by

Tonoyan vs. Dokuzyan Adversary Complaint

- 34 -

the United States Trustee "Okay, and aside from -- is it your parents'
residence, when we're talking about the place where this equipment is
stored, is that the same place that you live?";

- Defendant answered and stated orally under oath "Correct. I don't own
  it." when asked by the United States Trustee "Okay, and that -- that
  residence is your parents' residence, is that correct?";

- Defendant answered and stated orally under oath "I would say a few
  months." when asked by the United States Trustee "Okay, and how long
  has the machine been located at that spot?";

- Defendant answered and stated orally under oath "Correct." when asked
  by the United States Trustee "Okay, and you recently amended your
  schedules stating that you receive freelance income.";

- Defendant answered and stated orally under oath "Yes." when asked by
  the United States Trustee "Was all of that freelance income done with
  Felipe Mendez?";

- Defendant answered and stated orally under oath "Yes." when asked by
  the United States Trustee "Okay, and aside from this one piece of
  machinery that we've called an "embroidery machine", is any -- is any
  other business property located at your residence?";

- Defendant answered and stated orally under oath "There is a computer
  which he uses for his work, and a printer.' when asked by the United
  States Trustee "What kind of other business property?";

- Defendant answered and stated orally under oath "That is correct. Yes."

when asked by the United States Trustee "And when you say he, you mean Mr. Mendez, is that correct?";

- Defendant answered and stated orally under oath "No." when asked by the United States Trustee "And does anyone else work out of this location aside from you or Mr. Mendez?";

- Defendant answered and stated orally under oath "Yes." when asked by the United States Trustee "Okay, and do you know if you're the Lucy in the StitchCult website, there's a reference to Felipe and Lucy who "may answer your telephone call", are you the Lucy in that -- in that web description?";

- Defendant answered and stated orally under oath "I have not received any customer communication at StitchCult, no." when asked by the United States Trustee "Okay, and so do you receive calls to this business, business calls for StitchCult?";

- Defendant answered and stated orally under oath "He -- he thought it would have -- it would look good for him. However, that website in particular has not made much sales, and it was kind of just a dead end for him. So, I have not had any customer contact whatsoever. He -- he did mention if I could help -- or you know -- reply to people when he couldn't, but it never happened, there's no contact." when asked by the United States Trustee "Okay, so even though the website directs -- suggests they call Lucy because she's "more friendly", that -- that hasn't happened?";

- Defendant answered and stated orally under oath "No sir, it is not under my name." when asked by the United States Trustee "Alright, and when the embroidery machine was purchased, did you -- were you a part of that?";

- Defendant answered and stated orally under oath "For the computers -- Hovanes, um -- for the computers, Hovanes sent the money -- well, it was -- so the initial purchase was Hovanes' -- however, it was paid back, and that's the involvement I had." when asked by the United States Trustee "Okay, and how about the computers?";

- Defendant answered and stated orally under oath "He helped them both." when asked by the United States Trustee "Okay, so I'm a little confused. Did Hovanes help purchase the computers, or did he help pay the debt to Printify?";

- Defendant answered and stated orally under oath "Correct." when asked by the United States Trustee "Alright, in your bankruptcy papers you testified that you had not made any gift to anyone, and now, I believe your testimony today is that the $10,000 repayment was a gift to Mr. Mendez, is that correct?";

- Defendant answered and stated orally under oath "It was a gift, and it will be amended." when asked by the United States Trustee "Okay, so which is true, you said it was not a gift, and now you're saying today that it was a gift. Which statement is true?";

- Defendant answered and stated orally under oath "That's because uh --

Tonoyan vs. Dokuzyan Adversary Complaint

sir, I didn't know, I'm not very familiar with things for the process. I want you to know that I did not -- I didn't expect money. I did not hide anything on purpose. And when I did find out that I did have to include it, I tried my best and to -- to do it as quick as possible and to be as truthful as possible. So, I do apologize that it was inputted so late, but it was not on purpose." when asked by the United States Trustee "Okay, and -- okay, so you didn't testify about that gift until today. Why did you also not testify about your freelance income until you amended your bankruptcy papers?";

- Defendant answered and stated orally under oath "He does have a -- at his home he does have another computer, but that is about it, sir." when asked by the United States Trustee "Okay, alright, do you know if this business, aside from your residence, does any of the work -- is done anywhere else, is there other equipment located anywhere else? Anything like that?";

**D.    Ongoing Business Operations of the Debtor**

33.

## CLAIMS AND CAUSES OF ACTION

## COUNT I
### 28 U.S.C. § 2201
### Declaratory Judgment

34.    Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as if more fully set forth herein.

35.    Plaintiff seeks a declaration of their rights and the legal relations in this case and to all interested parties, including their status as a creditor with a bona fide claim.

Tonoyan vs. Dokuzyan Adversary Complaint

- 38 -

36.     Plaintiff seeks a declaration that they are not subject to and would not be subject to any sanctions, and that acts of Debtor and their Counsel in violation of applicable statutes and Court rules could be subject to sanctions and control by the statutory and inherent powers of this Court.

37.     Plaintiff seeks a declaration of applicable statutes, Court rules, constitutional provisions, and any written instruments to be construed in the litigation.

**COUNT II**
**11 U.S.C. § 523(a)(2)(A)**
**Fraud**

38.     Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as if more fully set forth herein.

39.     Pursuant to 11 U.S.C. § 727(b) a Chapter 7 discharge does not discharge claims of individuals that would be excepted from discharge under 523.

40.     The trustee, a creditor, or the United States trustee may object to the granting of a discharge under subsection (a) of 11 U.S.C. § 727.

41.     Section 523(a)(2)(A) excepts from discharge debts:

> (2) for money, property, services, or an extension, renewal of credit, to the extent obtained by –
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting debtor's or an insider's financial condition

42.     In the Ninth Circuit, to prove nondischargeability under § 523(a)(2)(A), the Plaintiff needs to show "(1) the debtor made representations; (2) that at the time the debtor knew they were false; (3) the debtor made those representations with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on these representations; and (5) the creditor sustained losses as a proximate result of the debtor's representations. *Ghomeshi v.*

*Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010); *In re Slyman*, 234 F.3d 1081, 1085

(9th Cir. 2000). A claim under 11 U.S.C. §523(a)(2)(A) is proven by a preponderance of the

evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). *In re Fernandez*, 2:18-bk-18159-RK, at

*20-21 (Bankr. C.D. Cal. July 7, 2021)

43.     For a debt to be excepted from discharge, the debtor must actually intend to

defraud the creditor. *In re Tsurukawa*, 258 B.R. 192, 198 (9th Cir. BAP 2001). However, direct

evidence of an intent to deceive is rarely shown. Hence, intent may be "inferred and established

from the surrounding circumstances." *In re Hultquist*, 101 B.R. 180 (9th Cir. BAP 1989); *In re

Anastas*, 94 F.3d 1280, 1285 (9th Cir.1996); *In re Dakota*, 284 B.R. 711, 721

(Bankr.N.D.Cal.2002). The Court must consider <u>whether the totality of the circumstances paints</u>

<u>a picture of deceptive conduct by the debtor that indicates an intent to deceive the creditor.</u> *In re

Basham*, 106 B.R. 453, 457 (Bankr.E.D.Va.1989) (emphasis added). Because no single objective

factor is dispositive, the assessment of intent is, thus, left to the fact-finder. *In re Jacks*, 266 B.R.

728, 742 (9th Cir. BAP 2001). *In re Campbell*, 490 B.R. 390, 401 (Bankr. D. Ariz. 2013).

44.     Section 523(a)(2)(A) has been applied when a debt arises from "forms of fraud,

like fraudulent conveyance schemes, that can be effected without a false representation." *Husky

Int'l Electronics, Inc. v. Ritz,* 578 U.S.136 S.Ct. 1581, 1586, 194 L.Ed.2d 655 (2016). It also has

been used to bar the discharge of debts resulting from misrepresentations about the value of

goods, property, and services. *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1763

(2018)

45.     "For the first element , the creditor must prove "misrepresentation, fraudulent

omission or deceptive conduct" by the debtor. *In re Slyman*, 234 F.3d at 1085. " *Fed. Trade

Comm'n v. Gugliuzza (In re Gugliuzza)*, 527 B.R. 370, 375 (C.D. Cal. 2015)... For the second

element, knowledge of the falsity or deceptiveness of one's conduct may be established by a showing of reckless indifference . *Advanta Nat'l Bank v. Kong (In re Kong)*, 239 B.R. 815, 826–27 (9th Cir. BAP 1999) ; *Castro v. Chang Sup Han (In re Chang Sup Han)*, No 2:13–cv–1524–ODW, 2013 WL 3404321, at *3 (C.D.Cal. July 8, 2013). For the third element, the intent to deceive is demonstrated with the express focus solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt. *In re Anastas*, 94 F.3d 1280 (9th Cir. 1996). For the fourth element, to explain justifiable reliance "we look to the most widely accepted distillation of the common law of torts[…]the Restatement (Second) of Torts (1976), published shortly before Congress passed the Act. The section on point dealing with fraudulent misrepresentation states that both actual and "justifiable " reliance are required. Id., § 537. The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." *Field v. Mans*, 516 U.S. 59, 70 (1995). The fifth element, "proximate cause under § 523(a)(2)(A) requires a finding by the Court that there is (1) causation in fact, which requires a defendant's misrepresentations to be a substantial factor in determining the course of conduct that results in loss and (2) legal causation, which requires a creditor's loss to " reasonably be expected to result from the reliance." Burks v. Bailey (In re Bailey),499 B.R. 873, 891 (Bankr. D. Idaho 2013); Beneficial Cal., Inc. v. Brown (In re Brown), 217 B.R. 857, 862 (Bankr. S.D. Cal. 1998); Restatement (Second) of Torts, § § 546, 548A) (" A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance."). *In re Urban*, BAP SC-13-1047-PaJuKu, at *1 (B.A.P. 9th Cir. Apr. 16, 2014)

46.    "Allegations of fraud [are] to be pleaded with particularity. See Fed. R. Civ. P. 9 ; Fed. R. Bank. P. 7009 ; *Vess v. Ciba–Geigy Corp.,*317 F.3d 1097, 1103–05 (9th Cir. 2003). In other words, a complaint must plead the "who, what, when, where, and how" of the alleged fraud. *Vess v. Ciba–Geigy Corp.*, 317 F.3d at 1106. *Brookview Apartments, L.L.C. v. Bronson Family Trust (In re Know Weigh, L.L.C.)*, 576 B.R. 189, 212 (Bankr. C.D. Cal. 2017). The Plaintiff must [specify] the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.* , 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks and alterations omitted); *Vess* , 317 F.3d at 1106 ("The plaintiff must set forth what is false or misleading about a statement, and why it is false." (quoting *Decker v. GlenFed, Inc.* , 42 F.3d 1541, 1548 (9th Cir. 1994) ))."

47.    In this Bankruptcy Case, the Defendant has made numerous representations which have turned out to perplexing at best, and flat out untrue at worst. The Defendant represented to Plaintiff in writing that "Until print is out of the fucking way and THEN I can launch new embroidery and literally be fine" in respect to her insolvency and need for a loan from Plaintiff, and Defendant represented that "I have my sister telling me I'm a horrible business woman and that we should stop and just a bunch of bullshit when I've put more work and effort into this than she has put to ANYTHING in her life combined. I work every fucking day nonstop and don't get rest or peace or ANYTHNG" in respect to operating a business with Felipe but testified under oath to the Chapter 7 Trustee's question if Defendant has any "ownership interest" in the business with "None at all ma'am, none at all.". Defendant fraudulently omits vital information to the administration of the estate and factors weighing in favor of discharge and engages in deceptive conduct when it suits her best. Defendant demonstrates reckless indifference with knowledge of the falsity of her representations and deceptiveness of her conduct given the divergent statements she makes depending on who her audience is, who is listening, and who she

1   can derive a benefit from the most. As her initial urgings to Plaintiff demonstrated, she was

2   desperate to incur above $11,000 in debt liabilities and obligations to Plaintiff in a malicious

3   manner and in bad faith, without even a single dollar going to other creditors and only funneling

4   the funds to her Business Partner as a gift with no expectation of repayment, with every intention

5   of petitioning for bankruptcy and avoiding the debt, a fact that has been established by

6   undeniable proof that she has filed for bankruptcy relief within 60 days of incurring the debt and

7   has demonstrated an intention of avoiding the debt by listing in her discharge and demonstrating

8   belligerence to questioning by the Trustees and to her Debtor duties and obligations to be

9   transparent and forthcoming, and most important, honest as part of petitioning for a privilege as

10   solemn as total discharge of debts through Chapter 7 Bankruptcy. Although Plaintiff could have

11   investigated further to ascertain the truth or falsity of Defendant's representation, such

12   investigation is not mandated by virtue of Plaintiff's justification in relying on Defendant's false

13   representations of fact to procure the loan from Plaintiff. Leaving Plaintiff Creditor holding the

14   bag, in a manner of speaking, by seeking discharge of this debt, has caused an injury and loss to

15   Plaintiff in a proximate manner traced directly to Defendant's misconduct, by acknowledge that

16   she took a debt from him, a debt she has only repaid 5% of as it collects interest charges and fees

17   by the day, week, and month—and now she seeks to wipe her hands clean without even the

18   slightest remorse.

19       48.    Plaintiff has met his burden of pleading such fraud with particularity, satisfying

20   all elements of the Cause of Action and therefore is entitled to relief by way of excepting the

21   debt from the Defendant's discharge order, should the Court in its wisdom divine such relief.

### COUNT III
### 11 U.S.C. § 523(a)(2)(B)
### False Statements in Writing

25       49.    Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as

26   if more fully set forth herein.

50.     Pursuant to 11 U.S.C. § 727(b) a Chapter 7 discharge does not discharge claims of

individuals that would be excepted from discharge under 523.

51.     The trustee, a creditor, or the United States trustee may object to the granting of a

discharge under subsection (a) of 11 U.S.C. § 727.

52.     Section 523(a)(2)(B) excepts from discharge debts:

> (2) for money, property, services, or an extension, renewal of credit, to the extent
> obtained by –
> (B) use of a statement in writing-
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property,
> services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive

53.     As the Supreme Court noted, "One of the "main purpose[s]" of the federal

bankruptcy system is "to aid the unfortunate debtor by giving him a fresh start in life, free from

debts, except of a certain character." *Stellwagen v. Clum*,245 U.S. 605, 617, 38 S.Ct. 215, 62

L.Ed. 507 (1918). To that end, the Bankruptcy Code contains broad provisions for the discharge

of debts, subject to exceptions. One such exception is found in 11 U.S.C. § 523(a)(2), which

provides that a discharge under Chapter 7, 11, 12, or 13 of the Bankruptcy Code "does not

discharge an individual debtor from any debt ... for money, property, services, or an extension,

renewal, or refinancing of credit, to the extent obtained by" fraud. This exception is in keeping

with the "basic policy animating the Code of affording relief only to an 'honest but unfortunate

debtor.' " *Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998)…Our

interpretation of the Bankruptcy Code starts 'where all such inquiries must begin: with the

language of the statute itself.' " *Ransom v. FIA Card Services, N. A.,* 562 U.S. 61, 69, 131 S.Ct.

716, 178 L.Ed.2d 603 (2011). As noted, the relevant statutory text is the phrase "statement

respecting the debtor's financial condition."

54.    "Because the Bankruptcy Code does not define the words "statement," "financial condition," or "respecting," we look to their ordinary meanings. There is no dispute as to the meaning of the first two terms. A "statement" is "the act or process of stating, reciting, or presenting orally or on paper; something stated as a report or narrative; a single declaration or remark." Webster's Third New International Dictionary 2229 (1976) (Webster's). As to "financial condition," the parties agree, as does the United States, that the term means one's overall financial status...For our purposes, then, the key word in the statutory phrase is the preposition "respecting," which joins together "statement" and "financial condition." As a matter of ordinary usage, "respecting" means "in view of: considering; with regard or relation to: regarding; concerning." Webster's 1934; see also American Heritage Dictionary 1107 (1969) ("[i]n relation to; concerning"); Random House Dictionary of the English Language 1221 (1966) ( "regarding; concerning"); Webster's New Twentieth Century Dictionary 1542 (2d ed. 1967) ("concerning; about; regarding; in regard to; relating to")." ... Use of the word "respecting" in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject. Cf. *Kleppe v. New Mexico*,426 U.S. 529, 539, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976) (explaining that the Property Clause, "in broad terms, gives Congress the power to determine what are 'needful' rules 'respecting' the public lands," and should receive an "expansive reading")."... Advancing that same expansive approach here, Appling contends that a "statement respecting the debtor's financial condition" is "a statement that has a direct relation to, or impact on the balance of all of the debtor's assets and liabilities or the debtor's overall financial status." Brief for Respondent 17 (internal quotation marks and citations omitted). "A debtor's statement describing an individual asset or liability necessarily qualifies," Appling explains, because it "has a direct impact on the sum of his assets and

liabilities." Ibid. "Put differently, a debtor's statement that describes the existence or value of a constituent element of the debtor's balance sheet or income statement qualifies as a 'statement respecting financial condition.' " Ibid… a statement is "respecting" a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status. A single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not. Naturally, then, a statement about a single asset can be a "statement respecting the debtor's financial condition."" *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1761 (2018)

55.    The Ninth Circuit has ascertained the elements of § 523(a)(2)(B) as follows: "(1) Plaintiffs provided money, property, services or credit to Defendants based on a written representation of fact by Defendant concerning his financial condition; (2) the representation was materially false; (3) Defendant knew the representation was false when made; (4) Defendant made the representation with the intention of deceiving the Plaintiff; (5) Plaintiff relied on the representation; (6) Plaintiff's reliance was reasonable; and (7) damage proximately resulted to Plaintiff. *Lin v. Hunt (In re Hunt)*, No. 20-00137-TLM, at *10 (Bankr. D. Idaho Aug. 17, 2021). The Ninth Circuit BAP has observed that…the elements for § 523(a)(2)(B) are the same as the elements for § 523(a)(2)(A), with the primary exception being that the fraudulent representations were made in writing. *Siriani v. Northwestern Nat. Ins. Co. (In re Siriani)*, 967 F.2d 302, 304 (9th Cir. 1992). In other words, to except a debt from discharge, a creditor must prove the same elements under both Code sections, but § 523(a)(2)(A) requires that the subject misrepresentation must not concern the Defendant's financial condition and is contained in a writing requirement, whereas § 523(a)(2)(B) requires a written misrepresentation about a debtor's

financial condition. Section 523(a)(2)(B) requires reasonable reliance by the creditor on the

misrepresentation; the somewhat lower justifiable reliance standard applies under §

523(a)(2)(A). *Field v. Mans*, 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). *Lin v.*

*Hunt (In re Hunt)*, No. 20-00137-TLM, at *11 (Bankr. D. Idaho Aug. 17, 2021). "

56.      The Ninth Circuit BAP's comments in *Wirkkala v. First Mutual Bank (In re*

*Wirkkala)*, 2006 WL 6811038, at *7 (9th Cir. BAP 2006) "are instructive about "material falsity"

for these purposes: A financial statement that leaves any discrepancy between the overall

impression left by the statement and the endorser's true financial status gives rise to a material

falsehood for purposes of § 523(a)(2)(B) . A long line of cases has held that in a personal

financial statement, the omission, concealment, or understatement of any of a debtor's material

liabilities constitutes a materially false statement. *Wirkkala v. First Mutual Bank (In re*

*Wirkkala)*, 2006 WL 6811038, at *7 (cleaned up). Numerous Courts have wrestled with what

constitutes a "material" falsity for purposes § 523(a)(2)(B) . While no precise definition has

emerged, the case law is uniform that merely showing that a statement is factually incorrect is

insufficient. Rather, Courts have found a materially false statement to be one which "paints a

substantially untruthful picture of a financial condition by misrepresenting information of the

type which would normally effect the decision to grant credit." *First Interstate Bank v. Greene*

*(In re Greene)*, 96 B.R. 279, 283 (9th Cir. BAP 1989) (quoting B*org Warner Central Env't Sys.*

*v. Nance (In re Nance)*, 70 B.R. 318, 321 (Bankr. N.D. Tex. 1987)). In other words, as this Court

understands this standard, if a debtor's representations in a writing given to a creditor to obtain

credit, were they known by the creditor to be untrue would cause the creditor to reconsider its

decision, the statements are materially false." Knowledge of falsity, as with intent, may be

inferred by circumstantial evidence and from the debtor's conduct. *Paik v. Lee (In re Lee)*, 536

B.R. 848, 858 (Bankr. N.D. Cal. 2015) ("As with § 523(a)(2)(A), knowledge and intent [under § 523(a)(2)(B) ] can be inferred from surrounding circumstances, including reckless disregard for the truth.") (citing *Gertsch v. Johnson & Johnson (In re Gertsch)*, 237 B.R. at 168 and *Edelson v. Comm'r of Internal Revenue*, 829 F.2d 828, 832 (9th Cir. 1987)); see also *Hirth v. Donovan (In re Hirth)*, 2014 WL 7048395, at *10. Circumstantial evidence is based on inference rather than personal knowledge or observation. Evidence, Black's Law Dictionary (11th ed. 2019)."" *Lin v. Hunt (In re Hunt)*, No. 20-00137-TLM, at *16-18 (Bankr. D. Idaho Aug. 17, 2021)

57.    Even a single written statement of the Defendant's financial condition that is false and upon which the debt was procured by is enough to except such debt from discharge. Defendant represented to Plaintiff regarding the business sales and revenues with her Business Partner in support of the loan request to Plaintiff that "I need a couple thousand to be caught up with all my stuff. Maybe like 6-7k? But once I launch new embroidery and be able to post I will be fine with making money. I've been making like $800-1k a day already with the old embroidery I have" even though she testified under oath to the Trustees that she does not utilize the embroidery machine—stored at her home and proximally in her possession—"for profit". If Plaintiff knew that Defendant lied about using the embroidery machine for any business purpose aside from keeping a watchful eye on it and using it for personal use, it would have caused the Plaintiff to reconsider their decision to extend even one dollar of credit to Defendant, as the statements are materially false, in a way that only she and her Business Partner would have knowledge of, if she had no means of repaying the debt she incurred and if she was representing the property of others and the business operations of others as her own profitable venture. Such written statements, an overwhelming amount of which have been included and incorporated in this complaint, demonstrate in their totality that they are not just factually incorrect or uncertain––but that they paint a very specific, favorable picture of the Defendant in extreme contrast to the representations she testified to and made orally under oath and incorporated in writing within her

1  bankruptcy papers, a favorable picture intending to entice and induce Plaintiff to extend credit,

2  and on the other end, induce and mislead this Honorable Court to grant her an even more

3  cherished benefit—total extinguishment of her pre-petition debts. Plaintiff is entitled to except

4  this debt from discharge due to such a false statement made explicitly in writing by the

5  Defendant, to the Plaintiff, in the manner of typing it through an electronic device, at a certain

6  time and manner, for a malicious and spiteful purpose so unbecoming of those who come before

7  this Honorable Court, and even more counter to the spirit of the Bankruptcy Code to extend the

8  benefit of discharge only to and for the "Honest, but Unfortunate Debtor".

9

10                                    **COUNT IV**
                                **11 U.S.C. § 523(a)(2)(C)**

11    **Consumer Debts for Luxury Goods or Services Are Presumed Nondischargeable**

12       58.    Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as

13  if more fully set forth herein.

14       59.    Pursuant to 11 U.S.C. § 727(b) a Chapter 7 discharge does not discharge claims of

15  individuals that would be excepted from discharge under 523.

16       60.    The trustee, a creditor, or the United States trustee may object to the granting of a

17
18  discharge under subsection (a) of 11 U.S.C. § 727.

19       61.    Section 523(a)(2)(C)(i) excepts from discharge debts for purposes of

20  523(a)(2)(A):

21                    (I) consumer debts owed to a single creditor and aggregating more than $500 for
                      luxury goods or services incurred by an individual debtor on or within 90 days
22                    before the order for relief under this title are presumed to be nondischargeable;
                      and
23                    (ii) for purposes of this subparagraph-
                      (I) the terms "consumer", "credit", and "open end credit plan" have the same
24                    meanings as in section 103 of the Truth in Lending Act; and
                      (II) the term "luxury goods or services" does not include goods or services
25                    reasonably necessary for the support or maintenance of the debtor or a dependent
26                    of the debtor

1

2     62.    The Defendant accumulated consumer debts owed to single creditors and

3  aggregating more than $500 for luxury goods or services incurred as an individual debtor on or

4  within 90 days before the order for relief under title 11 was entered and would presume to be

5  nondischargeable, by gifting Felipe Kamey Mendez over $10,000 in gratuitous cash transfers not

6  necessary for the maintenance and support of the Debtor or of any important family purpose to

7  be served; to purchase extravagant, indulgent, and nonessential vendor services adding to the

8  pleasure and comfort of Felipe and not absolutely necessary for the Debtor.

9     63.    It goes without saying that the presumption of nondischargeability arises from the

10  Defendant's admitted and testified to actions. In fact, Congress enacted the statute for this exact

11  scenario, "as the legislative history discloses, this language was added "to address a type of

12  unconscionable or fraudulent debtor conduct not heretofore considered by the Code — that of

13  loading up." S.Rep. No. 98-65, 98th Cong. 1st Sess. 58 (1983). According to the Senate Report,

14  "[i]n many instances, a debtor will go on a credit buying spree in contemplation of bankruptcy.""

15

16                              **COUNT V**
                          **11 U.S.C. § 523(a)(6)**
17                        **Willful and Malicious Injury**

18     64.    Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as

19  if more fully set forth herein.

20     65.    Pursuant to 11 U.S.C. § 727(b) a Chapter 7 discharge does not discharge claims of

21  individuals that would be excepted from discharge under 523.

22     66.    The trustee, a creditor, or the United States trustee may object to the granting of a

23  discharge under subsection (a) of 11 U.S.C. § 727.

24

25                              **COUNT VI**
                          **11 U.S.C. § 727(a)(2)**
26

Tonoyan vs. Dokuzyan Adversary Complaint

**Intent to Hinder, Delay, or Defraud a Creditor or an Officer of the Estate**

67.     Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as if more fully set forth herein.

## COUNT VII
### 11 U.S.C. § 727(a)(3)
**Concealed, Falsified, or Failed to Keep or Preserve Any Recorded Information**

68.     Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as if more fully set forth herein.

## COUNT VIII
### 11 U.S.C. § 727(a)(4)
**False Oath or Claim**

69.     Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as if more fully set forth herein.

## COUNT IX
### 11 U.S.C. § 727(a)(5)
**Failed to Satisfactorily Explain Any Loss or Deficiency of Assets to Meet Liabilities**

70.     Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as if more fully set forth herein.

## COUNT X
### 11 U.S.C. § 727(a)(7)
**Committed Any Act under 727(2)-(5) Concerning an Insider**

71.     Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as if more fully set forth herein.

## COUNT XI

Tonoyan vs. Dokuzyan Adversary Complaint

**11 U.S.C. § 707(a)(1)**
**Unreasonable Delay by the Debtor Prejudicial to Creditors**

72.    Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as if more fully set forth herein.

**COUNT XII**
**11 U.S.C. §§ 707(b)(1) and 707(b)(3)(A)–(B)**
**Abuse through Bad Faith or under the Totality of the Circumstances**

73.    Plaintiff hereby repeats, reiterates, and realleges all of the foregoing allegations as if more fully set forth herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Hovanes John Tonoyan respectfully requests that the Court enter judgment for Hovanes John Tonoyan and against Lusine Cristine Dokuzyan and/or her Counsel as follows:

A.    **Judicially Declaring** the rights and legal relations of the Interested Parties and of any statutes, court rules, constitutional provisions, and written instruments;

B.    **Dismissing** Debtor's Bankruptcy Case for Abuse, or alternatively;

C.    **Denying** entry of Debtor's Discharge, or alternatively;

D.    **Excepting** from Debtor's Discharge any and all debt claims belonging to Plaintiff Creditor Hovanes John Tonoyan including debt either listed on Official Form 106E/F, Schedule E/F Line 4.1 and other filings or testified to by Creditor Tonoyan or the Debtor under oath;

E.    **Granting** Leave to Amend liberally Plaintiff's filings to cure any deficiencies;

F.    **Accommodating** to Plaintiff's financial limitations and barriers to securing

Counsel, by construing pleadings liberally and demonstrating leniency for Plaintiff to be able to access justice and litigate his claims on their merits without prejudice from the Defendant or their counsel, and to not penalize Plaintiff without giving him a chance to cure and resolve infractions if they occur.

      G.      **Assignment** to Mediation as soon as practical if requirements have been met and necessary filings can be submitted, even if the Debtor objects or does not cooperation in good faith;

      H.      **Terminating or Conditioning** the Automatic Stay;

      I.      **Awarding** Creditor Tonoyan costs and fees entitled or incurred; and

      J.      **Awarding** any such other and further relief as the Court deems appropriate.

1

2

DATED: June 23rd, 2022

_____

HOVANES JOHN TONOYAN, Pro Se
6627 Beeman Ave
North Hollywood, CA 91606
818 281 7473

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

**RECEIVED**

JUN 24 2022

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Hovanes John Tonoyan | Lusine Cristine Dokuzyan |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Self-Represented  6627 667 Beeman Ave  H.J. North Hollywood, CA 91606  818 281 7473 | Sevan Gorginian  (818) 928-4445  450 N. Brand Blvd.  Suite 600  Glendale, CA 91203 |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin  X Creditor  ☐ Other  ☐ Trustee | X Debtor  ☐ U.S. Trustee/Bankruptcy Admin  ☐ Creditor  ☐ Other  ☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
• TO DECLARE THE RIGHTS AND LEGAL RELATIONS OF THE INTERESTED PARTIES UNDER 28 U.S.C. § 2201
• TO EXCEPT DEBT FROM DISCHARGE UNDER 11 U.S.C. §§ 523(a)(2)(A)–(C) and 523(a)(6)
• TO DENY DISCHARGE UNDER 11 U.S.C. §§ 727(a)(2)–(5) and 727(a)(7)
• TO DISMISS THE CHAPTER 7 BANKRUPTCY CASE UNDER 11 U.S.C. §§ 707(a)(1), 707(b)(1) and 707(b)(3)(A)–(B) BY WAY OF THE COURT'S OWN MOTION

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property – §542 turnover of property
[2] 12-Recovery of money/property - §547 preference
[3] 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
[4] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
[5] 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
[1] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐X Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $  $25,000 |

| Other Relief Sought | relief from the automatic stay (to condition or terminate it); extension for complaints and motions deadlines; leave to liberally amend filings and pleadings; adjournment or re-opening of 341 Meeting of Creditors; potential assignment to Mediation; leave to confer derivative standing to litigate on behalf of the CH7 and United States Trustees, the estate, and other creditors; invocation of sua sponte authority for (707)(b) dismissal of Debtor's case; any other relief equitable and just if statutory remedies fail their purpose. |
|---|---|

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR  Lusine Cristine Dokuzyan | BANKRUPTCY CASE NO.  1:22-bk-10283 | |
| DISTRICT IN WHICH CASE IS PENDING  Central District of California | DIVISION OFFICE  San Fernando Valley | NAME OF JUDGE  Honorable Martin R. Barash |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE  06 / 23 / 2022 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)  Hovanes John Tonoyan | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.